PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

USF RED STAR, INCORPORATED,
           *Petitioner,*

                v.                              No. 99-2600

NATIONAL LABOR RELATIONS BOARD,
           *Respondent.*

CHAUFFEURS, TEAMSTERS AND HELPERS
LOCAL 118, International
Brotherhood of Teamsters, AFL-
CIO,
           *Petitioner,*         No. 99-2651

                v.

NATIONAL LABOR RELATIONS BOARD,
           *Respondent.*

NATIONAL LABOR RELATIONS BOARD,
           *Petitioner,*

                v.

USF RED STAR, INCORPORATED;
CHAUFFEURS, TEAMSTERS AND HELPERS
LOCAL 118, International          No. 99-1079
Brotherhood of Teamsters, AFL-
CIO,
           *Respondents.*

On Petitions for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board.
(3-CA-19698, 3-CA-19739, 3-CB-6734, 3-CB-6894)

Argued: June 6, 2000

Decided: October 18, 2000

Before WILKINSON, Chief Judge, MURNAGHAN,*
Circuit Judge, and Henry M. HERLONG, Jr.,
United States District Judge for the District of South Carolina,
sitting by designation.

---

Enforced by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Herlong joined.

---

## COUNSEL

**ARGUED:** Paul M. Sansoucy, BOND, SCHOENECK & KING,
L.L.P., Syracuse, New York; Michael Thomas Harren, CHAMBER-
LAIN, D'AMANDA, OPPENHEIMER & GREENFIELD, Rochester,
New York, for USF Red Star, et al. Andrew J. Krafts, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON
BRIEF:** Subhash Viswanathan, BOND, SCHOENECK & KING,
L.L.P., Syracuse, New York, for USF Red Star, et al. Leonard R.
Page, General Counsel, Linda Sher, Associate General Counsel,
Aileen A. Armstrong, Deputy Associate General Counsel, Margaret
A. Gaines, Supervisory Attorney, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for Board.

---

*Judge Murnaghan heard oral argument in this case but died prior to
the time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

## OPINION

WILKINSON, Chief Judge:

This case involves a pact between officials of a union and a company to discharge an opponent of incumbent union officials in exchange for the union's agreement to modify the collective bargaining agreement. The National Labor Relations Board found that the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq., prohibits this practice. Since the Board's decision was supported by substantial evidence and the actions of the union and the company violated the fundamental principles of labor-management law, the Board's order shall be enforced.

### I.

John Hayes was a member of Local 118, International Brotherhood of Teamsters (the Union) in Rochester, New York. In December 1994, Hayes ran for union office on a ticket opposing Frank Posato and John Cantwell. Although the Posato-Cantwell ticket prevailed, the election was a bitter one. In January 1995, Hayes resumed working as an occasional or "casual" driver for the freight company USF Red Star. His supervisor was terminal manager Wayne Zakofsky. Between January and March 1995, Cantwell repeatedly ridiculed Hayes to Zakofsky, referring to Hayes as a "scumbag." Cantwell also expressed disdain for Hayes to Ron Morin, Red Star's Director of Field Services.

In March 1995, two other freight companies closed their Rochester terminals. Zakofsky saw this as an opportunity for Red Star to modify the costly "start-time" provisions of the current collective bargaining agreement. These provisions guaranteed drivers a start time between 7 a.m. and 8:30 a.m.; drivers who started before 7 a.m. were paid overtime and drivers who started after 8:30 a.m. were paid as if they had started at 8:30 a.m. Ron Morin primarily handled the negotiations, with oversight provided by Red Star Vice-President Roy Liller. In early April, Morin informed Zakofsky that the Union wanted Red Star to stop using Hayes as a driver. Zakofsky ignored this request because he did not think Morin had the authority to issue such a directive.

On April 28, two key events occurred. First, that morning Hayes had a preventable accident while driving a Red Star truck. There was no damage to customer property and the damage to the truck cost Red Star $15 to repair. Second, Morin and Zakofsky met with Posato and Cantwell to discuss the start-time provision. At the close of the meeting, Posato told Morin: "Ron, you know what I want. If you want to negotiate this type of contract, you know what I want." Posato and Morin then met privately for about ten minutes, after which Morin told Zakofsky that "Jack Hayes is gone." When Zakofsky indicated that he did not want to participate in the plot to terminate Hayes, Morin explained that if "we want to get . . . [the] type of negotiations that we want approved, Jack Hayes is gone."

Zakofsky issued Hayes a written warning for the accident but did not enter it into the company's computer. Although Red Star sometimes fired occasional drivers for having preventable accidents, Zakofsky believed that terminal managers had the discretion to overlook minor accidents of this type.[1] He also thought that if the accident was entered into the corporate computer, it would be used as a pretext to terminate Hayes. In the following weeks, both Morin and Liller instructed Zakofsky to phase out Hayes on account of the Union negotiations. Morin specifically told Zakofsky that "we're going to get more out of the negotiations, but in turn the Union wants Jack Hayes gone." On both June 6 and 7, Liller insisted that Zakofsky fire Hayes. During the second conversation Zakofsky agreed to terminate Hayes because Liller threatened to do it himself if Zakofsky did not. After Zakofsky fired Hayes, Liller terminated Zakofsky, ostensibly for failing to report Hayes' accident.

Administrative Law Judge (ALJ) Raymond Green ruled that Red Star violated 29 U.S.C. § 158(a)(3) and (1) by discharging Hayes for engaging in protected union activity, and violated 29 U.S.C. § 158(a)(1) by discharging Zakofsky for refusing to fire Hayes. The ALJ also found that the Union had violated § 158(b)(1)(A) and (b)(2) for causing Hayes to be discharged for engaging in protected union

---

[1]Red Star's purported practice of firing drivers who have even one preventable accident is limited to occasional or "casual" drivers. Red Star does not terminate permanent or "preferred" drivers solely because of a preventable accident.

activity. The National Labor Relations Board affirmed this decision, and ordered Red Star and the Union to stop their unfair labor practices. The Board also ordered Red Star to reinstate Hayes and Zakofsky with back-pay. Finally, the Board required the Union to notify Red Star that it agreed to Hayes' reinstatement. Red Star and the Union both appeal.

## II.

### A.

This court enforces Board orders whenever substantial evidence exists to support the Board's factual findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951); *Sam's Club v. NLRB*, 173 F.3d 233 (4th Cir. 1999). In a case such as this where there are both legitimate and illegitimate reasons advanced for challenged conduct, the court must determine if the Board properly applied the burden shifting test approved by the Supreme Court in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 403 (1983), *overruled on other grounds by Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, (1994) (adopting the test set forth in *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981)).

Under the *Wright Line* test, the Board must first find substantial evidence that the employee's protected activity was "a motivating factor" in the employer's decision to take adverse action against the employee. *See Wright Line*, 662 F.2d at 906. The employer then bears the burden of proving that the discharge would have occurred even in the absence of the protected activity. *See id.*; *see also NLRB v. Nueva Eng'g Inc.*, 761 F.2d 961, 968-69 (4th Cir. 1985). If the Board believes the employer's stated lawful reasons are non-existent or pretextual, the defense fails. *See Transp. Mgmt. Corp.*, 462 U.S. at 398; *see also Nueva Eng'g Inc.*, 761 F.2d at 968-69.

### B.

A company violates 29 U.S.C. § 158(a)(3) if it discharges an employee for engaging in protected union activity. *See Transp. Mgmt. Corp.*, 462 U.S. at 398. A company violates 29 U.S.C. § 158(a)(1) if

it discharges an employee for refusing to engage in activity that would otherwise be unlawful under the NLRA. *See id.* Although supervisors are not explicitly covered by the NLRA, § 158(a)(1) is violated if a supervisor's discharge results from his refusal to commit an unfair labor practice. *See ARA Leisure Serv., Inc. v. NLRB*, 782 F.2d 456, 459 n.3 (4th Cir. 1986); *Parker-Robb Chevrolet, Inc.*, 262 NLRB 402, 404 (1982), *enforced sub nom*, *Automobile Salesmen's Union Local 1095 v. NLRB*, 711 F.2d 383 (D.C. Cir. 1983). "[I]f employers are allowed to force supervisors to engage in unfair labor practices, this necessarily results in direct interference with the affected rank-and-file employees in the exercise of their [protected] rights." *Gerry's Cash Markets, Inc. v. NLRB*, 602 F.2d 1021, 1023 (1st Cir. 1979).

A union violates 29 U.S.C. § 158(b)(1)(A) by restraining an employee from engaging in protected union activity and violates 29 U.S.C. § 158(b)(2) for causing or attempting to cause an employee to be discharged for engaging in protected union activity. These provisions make it illegal for unions to act in a manner that is contrary to the interests of its members. For example, a union cannot, consistent with § 158(b)(1)(A) and (b)(2), put the personal gain of incumbent union officers in front of the interests of the union membership.

III.

A.

Red Star claims it did not violate § 158(a)(3) because it fired Hayes due to his accident, not because of the Union's demands. Red Star concedes that the first part of the *Wright Line* test is satisfied because the animosity generated by Hayes' failed election bid was a motivating factor in his firing. Red Star disputes, however, the Board's decision to reject its affirmative defense. The Board concluded that Red Star did not have a uniform policy of discharging occasional drivers who have preventable accidents and that this reason was pretextual.

We agree. Although Red Star introduced evidence that some occasional drivers had been fired for having preventable accidents, it failed to prove these terminations were the result of a uniform policy. First, Red Star failed to produce any records of still-employed drivers

whose files could have been examined for the presence or absence of preventable accidents. Instead, Red Star only produced records of terminated occasional drivers. Even these records often listed an accident as just one of many reasons for termination.

Second, Zakofsky testified that he and other Terminal Managers had discretion to overlook minor accidents by occasional drivers. The ALJ found Zakofsy's testimony quite credible on this point and "[a]bsent extraordinary circumstances, we will not disturb a fact-finder's credibility determinations." *Columbus-America Discovery Group v. Atlantic Mutual Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995). This evidence, plus the Board's findings that Hayes' accident cost Red Star only $15 and that occasional drivers were in short supply, supports the conclusion that Red Star would not have fired Hayes over the accident alone.

Red Star's reliance on *Transcon Lines*, 259 NLRB 1424 (1982), and *Rock-Tenn Co.*, 319 NLRB 1139 (1995), *enforced*, 101 F.3d 1441 (D.C. Cir. 1996), is misplaced. In those cases, there was "no direct evidence of exceptions to the accident reporting and rule enforcement procedures." *Transcon Lines*, 259 NLRB at 1432. Here, there was direct evidence of exceptions in the form of Zakofsky's credited testimony. *Synergy Gas Corporation v. NLRB*, 19 F.3d 649, 653 (D.C. Cir. 1994), is also inapposite because in that case the employer used accident records to prove the existence of a non-discretionary discharge policy. This is exactly the sort of evidence that Red Star failed to produce. Thus, since Red Star failed to establish its affirmative defense, the Board was correct in concluding that Hayes was terminated in response to the Union's demands.

### B.

Red Star claims that firing Zakofsky did not violate 29 U.S.C. § 158(a)(1) because he was fired for concealing Hayes' accident, not for refusing to terminate Hayes. We disagree. There is substantial evidence that Red Star terminated Zakofsky for his refusal to phase out Hayes. First, given that the Union leadership was unlawfully pressuring Red Star to dispatch its opponent Hayes, Zakofsky believed that reporting the accident would provide a pretextual basis for Hayes' discharge. His desire not to participate in an unlawful conspiracy was

protected and could not serve as a valid basis for his termination. *See ARA Leisure Serv.*, 782 F.2d at 459 n.3 (citing *Parker-Robb*, 262 NLRB at 402-03).

Second, Zakofsky had worked for Red Star for eleven years and had received the "service terminal of the year" award in 1993 and 1994. Vice-President Liller described Zakofsky as being a "very, very diligent" employee. Red Star presented no evidence of other improprieties by Zakofsky. Zakofsky's employment record, combined with the fact that the accident he failed to report cost $15 to repair, supports the Board's conclusion that Red Star violated 28 U.S.C. § 158(a)(1) by terminating Zakofsky for failing to join the plot to oust Hayes. Of course, company policies designed to encourage the reporting and sanctioning of even minor accidents are altogether legitimate. *See Paramount Mining Corp. v. NLRB*, 631 F.2d 346, 348 (4th Cir. 1980) (NLRA does not interfere with an employer's right to establish standards for selecting and discharging employees). However, the NLRA does prevent an employer from seizing upon a trivial $15 accident to force the opponent of incumbent union officers off the job.

## C.

The Union claims it violated neither 29 U.S.C. § 158(b)(1)(A) nor § 158(b)(2) during its negotiations with Red Star. Instead, the Union claims that it agreed to modify the start-time provision in order to prevent the closure of Red Star's Rochester terminal. According to the Union, the recent closure of two other Rochester terminals gave Red Star so much leverage that the Union was in no position to make any demands, not even for Hayes' termination. We disagree. The evidence shows that the Union leadership used whatever bargaining power it had to expel an election opponent, rather than to protect the interests of its membership. This self-serving behavior by the Union's officers is at odds both with the purpose of a labor union and with the laws that govern union behavior.

The Board had substantial evidence of Posato and Cantwell's animus towards Hayes. The record reflects that Cantwell referred to Hayes as a "scumbag" and later told Ron Morin that Hayes was a "troublemaker." The Board also had substantial evidence that Posato and Cantwell used the start-time negotiations to oust Hayes. The latter

evidence came in the form of Postato's "you know what I want" statement to Morin, Morin's subsequent "Jack Hayes is gone" statement to Zakofsky after the April 28 meeting, and Liller and Morin's calls to Zakofsky concerning the need to phase out Hayes.[2] The Union claims Posato's statement to Morin was a reference to the Union's desire to extend the routes for Rochester drivers. It is undisputed, however, that this proposed route change was one that Red Star also wanted. Even if the Union's explanation of Posato's statement were true, that does not undermine the evidence of animus towards Hayes. Indeed, even Red Star concedes that improper union pressure played a role in Hayes' termination.[3]

---

[2]There is no merit to the Union's claim that Liller and Morin's statements constituted inadmissible hearsay and thus were erroneously relied upon by the Board. Federal Rule of Evidence 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay." Here, the statements relied upon by the Board were made by the Union and Red Star management, each a coconspirator, and were in furtherance of the conspiracy to terminate Hayes. *See Groves-Granite*, 229 NLRB 57, 66 n.44 (1977) (considering the co-conspirator exception but declining to apply it because the statements did not satisfy the "in furtherance of" requirement); *see also World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985) (co-conspirator exception applies in both civil and criminal cases).

[3]The Union's remaining arguments also lack merit. The Board declined to apply the *Wright Line* burden-shifting test because that test only applies when there are both legitimate and illegitimate reasons for the challenged conduct. Since the Union never claimed it had a lawful reason to seek Hayes' termination, *Wright Line* was never triggered. The Union claims that since Red Star did not violate 29 U.S.C. § 158(a)(3) (making it unlawful to discharge an employee for engaging in protected union activity), it could not have violated 29 U.S.C. § 158(b)(2) (making it unlawful for a union to cause or attempt to cause an employee to be discharged for engaging in protected union activity). This claim is equally without merit. The predicate assumption is erroneous and a finding of a § 158(a)(3) violation is not a prerequisite for finding a § 158(b)(2) violation. *See*, *e.g.*, *Iron Workers Local 377 (M.S.B., Inc.)*, 299 NLRB 680, 683-84 n.7 (1990).

IV.

Neither Red Star nor the Union had the right under the NLRA to penalize Hayes for his participation in a union election. It may suit the aims of incumbent union officers to oust past and future election opponents. It may suit a company to agree to terminate such individuals in order to secure an advantageous collective bargaining concession. The NLRA, however, does not allow union officers to ensconce themselves at the expense of those they represent. And it does not permit management to collude in such misconduct. Sanctioning this course would undermine union democracy and allow purely personal aims to tarnish the collective bargaining process. Since the Board had substantial evidence to support its decision, its order is

*ENFORCED*.